*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellant,

v

MARTI JAMES SCHRAUBEN,

        Defendant-Appellee.

UNPUBLISHED
May 21, 2020

No. 346134
Ionia Circuit Court
LC No. 2014-016277-FH

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

MARTI JAMES SCHRAUBEN,

        Defendant-Appellant.

No. 346462
Ionia Circuit Court
LC No. 2014-016277-FH

Before: TUKEL, P.J., and MARKEY and GADOLA, JJ.

PER CURIAM.

In these consolidated appeals, plaintiff, the People of the State of Michigan, appeals by delayed leave granted the amended judgment of the trial court entered against defendant, Marti James Schrauben, who was convicted after pleading no contest to 70 counts of uttering and publishing, MCL 750.249, and three counts of converting funds from prepaid funeral contracts, MCL 328.232(1). Defendant was sentenced to 307 days' incarceration, which represented time served, and was ordered to pay restitution in the amount of $234,394.67. Plaintiff challenges the

-1-

trial court's Order Regarding Restitution in which the trial court ordered that defendant be given credit toward the restitution amount for amounts allegedly owed by the victim to defendant under promissory notes executed in 2005.

Defendant also appeals by delayed leave granted the same amended judgment, and also challenges the trial court's Order Regarding Restitution. Defendant contends that the order improperly awarded Michael Lehman restitution instead of awarding restitution to certain insurers or individual clients of the Lehman funeral home and in amounts totaling $85,010.04. For reasons stated herein, we vacate the trial court's order regarding restitution and remand to the trial court.

## I. FACTS

This case arises from defendant's fraudulent activities that also gave rise to a previous case, which was before this Court in *People v Schrauben*, 314 Mich App 181; 886 NW2d 173 (2016). In that case, this Court explained the background facts of defendant's fraud as follows:

> Defendant and Michael Lehman jointly owned two funeral homes in Portland and Ionia, where they sold prepaid funeral plans. In 2005, Lehman bought out defendant's shares in the business and defendant began to operate a country club. Lehman testified that he and his wife discovered some financial irregularities after defendant left, but they did not give them much consideration. In December 2007, defendant talked to Lehman about returning to work for the funeral homes as an employee, which Lehman agreed to, but testified that defendant was not allowed to have any direct financial responsibilities. According to Lehman, if a customer arranged for a prepaid funeral plan with defendant, Lehman was to handle the transaction, which included bank deposits. Lehman managed the Portland chapel while defendant worked at the Ionia chapel.

> Lehman testified that after defendant had been working at the Ionia chapel for at least two years, he learned defendant had been making deposits himself, which caused Lehman to investigate further. Lehman discovered that customers who had intended to purchase prepaid funeral plans had actually written checks to Schrauben Management, which was a holding company for the country club owned by defendant and had nothing to do with the funeral home business. In addition, several of the escrow accounts and insurance policies used to fund the prepaid funerals had been paid out before the deaths of the individuals who had purchased those plans. According to Lehman, his name was forged on checks originally made payable to the funeral home and then signed over to Schrauben Management. [*Schrauben*, 314 Mich App at 186-187.]

In that case, defendant was convicted after a jury trial of eight counts of uttering and publishing, MCL 750.249, four counts of forgery, MCL 750.248, and four counts of fraudulent insurance acts, MCL 500.4511. Defendant was sentenced to 11 months in jail for the uttering and publishing convictions, 9 months in jail for the forgery convictions, and 16 months in prison for the fraudulent insurance acts convictions. *Schrauben*, 314 Mich App at 185. Although the jury also convicted defendant of one count of conducting a criminal enterprise, MCL 750.159i(1), one count of receiving the proceeds of a criminal enterprise, MCL 750.159i(3), and eight counts of

embezzlement, MCL 750. 174, the trial court granted defendant's motion for a directed verdict of acquittal, dismissing those charges. This Court affirmed defendant's convictions and sentences, and also affirmed the trial court's decision granting defendant's motion for a directed verdict of acquittal on the additional charges. *Schrauben*, 314 Mich App at 186.

In addition to that criminal action, the attorney general initiated this case charging defendant with 70 counts of uttering and publishing and 3 counts of converting funds from prepaid funeral home contracts. The trial court granted defendant's motion to dismiss the uttering and publishing charges, finding that the charges were precluded by double jeopardy. This Court peremptorily reversed the decision of the trial court and remanded the matter for reinstatement of the 70 uttering and publishing charges.[1] Defendant thereafter pleaded no contest to the charges as part of a *Cobbs*[2] agreement, agreeing to pay restitution in an amount to be determined by the trial court.[3]

Plaintiff submitted documentation demonstrating that defendant had defrauded Lehman of $436,179.45, plus interest accrued through May 31, 2018, of $43,514.96, for a total of $479,694.41. The trial court held an evidentiary hearing to determine the amount of the restitution, at the conclusion of which the trial court issued its Order Regarding Restitution, explaining the underlying facts as follows:

> The parties were business partners in the Schrauben-Lehman Funeral Home, PC. They reached an agreement, essentially, that Michael Lehman and Lehman Funeral Homes, PC, hereinafter referred to as Victims, would buy out the Defendant's interest in the business. On February 15, 2005, two notes were executed, each for $277,700 wherein the Victims, for a total of $555,400, would pay the Defendant $100,000 down and make $4,305.76 per month payments for 15 years. It is undisputed from testimony at the restitution hearing that the Victims made 60 monthly payments from March, 2005 to August, 2010 along with a [payment of] $100,000 for payment totaling $358,345.60. Pursuant to a Settlement Agreement and Release filed in the Defendant's bankruptcy, approximately $205,000 was remaining on each note for an approximate total of $410,000.
>
> In May, 2010 when the Victim was refinancing his business loan, the parties agreed that the Defendant would execute a Discharge of Lien that was filed with the Register of Deeds. It was agreed by the parties at the restitution hearing that this was for the benefit of the Victims for refinancing purposes only and that the

---

[1] *People v Schrauben*, unpublished order of the Court of Appeals, issued June 17, 2016 (Docket No. 332131).

[2] *People v Cobbs*, 443 Mich 276; 505 NW2d 208 (1993).

[3] Although defendant agreed as part of his plea agreement to pay restitution as determined by the trial court, the trial court permitted defendant to reserve the right to challenge the restitution amount.

Victims continued to owe the money pursuant to the terms of the notes to Defendant.

In September, 2010, a second Discharge of Lien was executed because, according to the testimony at the restitution hearing, it was apparent to the Victims at that time that the Defendant had misappropriated funds from the funeral home business. The parties agreed that at no time after that date, did the Victims make any further payment to Defendant on the debt to buy out his interest in the funeral home. During that same month, September, 2010, when the original notes and mortgage could not be located, the Defendant executed an Indemnification Agreement to the Victims to hold them harmless from the debt should the notes be located in the future.

On May 13, 2013, the Defendant filed a Chapter 7 bankruptcy in the Western District of Michigan. The Defendant included the notes in his assets but testified that he put a nominal, $5,000 value on the notes because he was told he had to list it as an asset "because the notes were technically still there," but that he felt "it was all taken care of" or satisfied.

Unbeknownst to the parties at the time, Dickinson Wright, PLLC, a law firm that had done work for the Defendant, and a listed creditor in the bankruptcy petition, had the original notes in its possession. According to the testimony at the restitution hearing of Michael Perry, attorney for the Victims, Dickinson Wright claimed it had a possessory lien on the notes for legal fees owed by the Defendant such that it was a prior secured party and that it held the notes separate and independent of the bankruptcy trustee. According to Mr. Perry, the notes had been in the possession of Dickinson Wright since February, 2005. It then sought to enforce its possessory interest in the notes in the bankruptcy matter.

In February, 2016, Dickinson Wright, PLLC, sent a demand to the Victims, advising them that any interest Defendant had in the notes had been assigned to it on February 16, 2016, that the Victims were in default and that full payment of $260,00[0] on each note for a total of $520,000 was immediately due.

Ultimately there was a settlement in the Bankruptcy Court, exclusive of the restitution issue here. The Victim[s] paid $100,000 to discharge any remaining debt owed Defendant on the notes. Dickinson Wright was to receive $20,000 and the bankruptcy estate was to get $80,000. However, according to attorney Perry for [the] Victim[s], the Bankruptcy Trustee and Dickinson Wright agreed that the Bankruptcy Trustee would hire Dickinson Wright to defend the Trustee in a lawsuit against the Victims to collect on the note[s]. So in lieu of litigation, they agreed to ultimately split the $100,000 payment from Lehman 50/50 between Dickinson Wright and the trustee for the Bankruptcy Estate. Thereafter, according to the People's Supplemental Brief, the Defendant amended his asset Bankruptcy Schedule from $5,000 to $50,000 noting "claim against Lehman Holdings for unpaid purchase price of funeral home for $500,000, valu[e] questionable."

Before the trial court, defendant asserted that he should be allowed to offset the unpaid balance on the 2005 promissory notes against the amount of restitution. Plaintiff argued that it was improper to use the debt secured by the promissory notes to offset defendant's restitution obligation because defendant no longer held any interest in the notes, having assigned the notes to Dickinson Wright, and also because the notes should have been the property of defendant's Chapter 7 bankruptcy estate. The trial court determined that defendant should be allowed a $410,000 setoff against his restitution obligation, which reflected the outstanding balance Lehman owed defendant on the two promissory notes. In its Order Regarding Restitution, the trial court explained, in relevant part:

> Michigan law provides that when sentencing a defendant convicted of a crime, the court shall order that the defendant make full restitution to any victim of the defendant's course of conduct that gives rise to the conviction. MCL 780.766(2). MCL 780.767(1) provides that in determining the amount of restitution, the court shall consider the amount of the loss sustained by any victim as a result of the offense.

> \* \* \*

> After consideration of the respective arguments, this Court, in the interests of justice and equity, finds that a set off is appropriate. The Victims received significant value, that being full ownership of the funeral business and the two buildings, when the defendant took no further action to enforce the notes and filed the Discharge of Lien in September, 2010. It is also recognized that although the Victims received significant value, they also suffered significantly being left to "make good" on all of the misappropriated funds and answer the concerns and inquiries of their clientele.

> This Court has carefully considered the treatment of the notes and the Settlement Agreement in the Bankruptcy Estate. It is significant to this Court that the Defendant himself did not seek to enforce the notes, that he assigned a nominal value to them in his asset schedule in the initial filing and that Dickinson Wright, as assignee, took only the interest the Defendant had in them which, in this Court's opinion, was that nominal value. The fact that the Victims were willing to pay $100,000 for the return of the notes along with $50,000 in attorney fees is significant. It is indicative of the fact that they, too, recognize Defendant forfeited a substantial value of approximately $520,000 when he did not seek enforcement of his rights under the notes, albeit understandably due to his bad acts.

> As the Defendant has argued in his Brief in Response to the Prosecution's Supplemental Restitution Brief, the Crime Victims' Rights statute is designed to fully compensate but not "doubly" compensate a victim. "The abhorrence of double compensation is well established in our jurisprudence. This Legislature wanted to place the financial burden of crime on the criminal, while fully, but not overly compensating the victim . . ." *People v Washpun*, 175 Mich App 420, 425 (1[9]89). This Court finds that if it does not set off the value of the notes to

Defendant in the determination of restitution that it would be tantamount to "doubly," or at a minimum, overly compensating the Victims.

* * *

What was due on principle [sic] at that time, pursuant to the Settlement in the bankruptcy, was $205,000 per note for a total of $410,000. In the analysis of this Court, Defendant forfeited his right to claim interest on that amount when he filed the Discharge. Accordingly, only the unpaid principal shall be set off in the final determination of restitution.

The trial court denied both parties' motions for clarification and/or reconsideration, but reduced the setoff amount from $410,000 to $395,299.74, based on documentation provided by plaintiff reflecting the outstanding balance on the notes. The trial court also determined that Lehman would be "held harmless" for the $100,000 payoff to Dickinson Wright and the $50,000 in attorney fees incurred in resolving the issue arising from the outstanding promissory notes. After making another clerical correction, the trial court thereafter entered the amended judgment of sentence ordering that defendant pay Lehman restitution in the amount of $234,394.67, plus interest. This Court granted both parties' applications for delayed leave and consolidated the appeals.[4]

## II. DISCUSSION

### A. CASE NO. 346134

Plaintiff contends that the trial court incorrectly determined that defendant was entitled to offset against the restitution amount the amounts that Lehman allegedly owed defendant under the 2005 promissory notes, arguing that defendant does not have a valid claim under the promissory notes. Because we conclude that the rights and duties of the parties under the 2005 promissory notes are unrelated to the determination of the loss suffered by Lehman as a result of defendant's criminal activities in this case, we agree that the restitution amount should not be offset by the amounts allegedly owed by Lehman on the promissory notes.

This Court reviews for an abuse of discretion the trial court's calculation of a restitution amount, while reviewing the trial court's factual findings for clear error. *People v Foster*, 319 Mich App 365, 374; 901 NW2d 127 (2017). A trial court abuses its discretion when it chooses an outcome outside the range of principled outcomes, *People v Lee*, 314 Mich App 266, 272; 886 NW2d 185 (2016), or when it makes an error of law. *People v Duncan*, 494 Mich 713, 723; 835 NW2d 399 (2013). The proper application of MCL 780.766(2) and MCL 769.1a, which authorize the trial court to award restitution, is a matter of statutory interpretation that this Court reviews de novo. *Foster*, 319 Mich App at 374.

---

[4] *People v Schrauben*, unpublished order of the Court of Appeals, entered March 26, 2019 (Docket No. 346134); *People v Schrauben*, unpublished order of the Court of Appeals, entered March 26, 2019 (Docket No. 346462).

Under the Michigan Constitution, crime victims have a constitutional right to restitution. Const 1963, art 1, § 24; *People v Turn*, 317 Mich App 475, 479; 896 NW2d 805 (2016). In addition, in Michigan there are two main statutes that govern restitution. *Foster*, 319 Mich App at 375. The general restitution statute is MCL 769.1a, and it provides, in relevant part:

(2) Except as provided in subsection (8), when sentencing a defendant convicted of a felony, misdemeanor, or ordinance violation, the court shall order, in addition to or in lieu of any other penalty authorized by law or in addition to any other penalty required by law, that the defendant make full restitution to any victim of the defendant's course of conduct that gives rise to the conviction or to the victim's estate. [MCL 769.1a(2).]

Similarly, MCL 780.766(2), which is part of the Crime Victim's Rights Act (CVRA), 780.751 *et seq*., provides, in relevant part:

(2) Except as provided in subsection (8), when sentencing a defendant convicted of a crime, the court shall order, in addition to or in lieu of any other penalty authorized by law or in addition to any other penalty required by law, that the defendant make full restitution to any victim of the defendant's course of conduct that gives rise to the conviction or to the victim's estate. . . . [MCL 780.766(2).]

One purpose of the CVRA is "to enable victims to be compensated fairly for their suffering at the hands of convicted offenders." *People v Garrison*, 495 Mich 362, 368; 852 NW2d 45 (2014) (quotation marks and citation omitted). The intent of the Legislature when enacting the CVRA was to shift the burden of loss arising from criminal conduct from the victim to the perpetrator; the statute is to be liberally construed to effectuate this intent. *People v Allen*, 295 Mich App 277, 282; 813 NW2d 806 (2011). The statute's goal of fair compensation is effectuated by the statutory directive to courts to order defendants to pay restitution that is "maximal and complete." *Garrison*, 495 Mich at 368. Although it is not the purpose of restitution to create a windfall for crime victims, restitution is intended to ensure that victims are made whole for their losses to the extent possible. *In re White*, ___ Mich App ___, ___; ___ NW2d ___ (2019) (Docket No. 342771); slip op at 2. The prosecution has the burden of establishing the proper amount of restitution by a preponderance of the evidence. MCL 780.767(4); *People v Fawaz*, 299 Mich App 55, 65; 829 NW2d 259 (2012). A preponderance of the evidence is evidence that, when weighed with the opposing evidence, has "more convincing force and greater probability of truth." *People v Cross*, 281 Mich App 737, 740; 760 NW2d 314 (2008).

The amount of restitution must be based upon the actual loss suffered by the victim. *Fawaz*, 299 Mich App at 65. The CVRA, however, does not explain how to determine the amount of loss sustained by a victim, and this Court has concluded simply that the amount of restitution "should be based upon the evidence." *People v Gubachy*, 272 Mich App 706, 713; 728 NW2d 891 (2006) (quotation marks and citation omitted). The restitution amount cannot be based upon speculation or conjecture, and must be supported by a reasonably certain factual foundation. *In re White*, ___ Mich App at ___; slip op at 3; *People v Wahmhoff*, 319 Mich App 264, 270; 900 NW2d 364 (2017). Restitution can be awarded for related losses, such as lost profits or the value of time and resources spent, *Fawaz*, 299 Mich App at 66, and a restitution award also may include interest. *People v Law*, 459 Mich 419, 428; 591 NW2d 20 (1999). Including these items in an award of restitution

makes a victim as whole as possible. *In re White*, ___ Mich App ___; slip op at 3. The controlling factor in determining the amount of restitution is the loss to the victim, and not merely what the defendant took. *Id.*

However, MCL 780.766(2) requires "a direct, causal relationship between the conduct underlying the convicted offense and the amount of restitution to be awarded." *People v McKinley*, 496 Mich 410, 421; 852 NW2d 770 (2014). Restitution should only be awarded for amounts that are a direct result of the defendant's criminal acts and only if the amounts can be easily ascertained and measured. *People v Byard*, 265 Mich App 510, 513; 696 NW2d 783 (2005). The statutory scheme for restitution is separate and independent of any damages that may be sought in a civil proceeding; restitution is not a substitute for civil damages. *People v Lee*, 314 Mich at 275.

In this case, plaintiff submitted documentation to the trial court establishing that defendant's fraudulent activities resulted in defendant taking from Lehman the amount of $436,179.45. Defendant argued before the trial court, however, that Lehman owed him money from a past transaction. Specifically, defendant argued that the promissory notes that related to defendant's sale of his interest in the business to Lehman in 2005, represented a debt that Lehman never fully repaid. Defendant argued that when Lehman discovered defendant's fraud in 2010, he stopped paying on the promissory notes, and defendant chose not to enforce the notes. Defendant argues that as a result, Lehman never paid the full balance owing on the notes and would therefore realize a windfall if he received restitution for the full amount of the fraud. The trial court agreed with defendant's contention that the restitution amount should be reduced by the amount that Lehman did not pay under the 2005 promissory notes.

Whether Lehman continued to owe defendant money under the 2005 promissory notes, however, was beyond the scope of the trial court's duty to determine and order restitution. As discussed, the amount of restitution must be based upon the actual loss suffered by the victim as a result of a defendant's fraudulent activities. *Fawaz*, 299 Mich App at 65. Here, it was the trial court's obligation to determine the amount of loss incurred by Lehman as a result of defendant's fraud, which took place from 2008 to 2010. But the trial court's decision reaches beyond the question of the loss suffered by the victim as a result of defendant's fraud, and extends to determining the rights and duties of the parties under the 2005 promissory notes. During the hearing on the motion for clarification, the trial court described its determination to offset the balance on the 2005 notes against the restitution amount as a "holistic assessment of this matter." However, it was not within the trial court's discretion in this criminal action to resolve a different financial dispute between defendant and Lehman and offset the restitution by that amount.

The question of the enforceability of the 2005 notes and the alleged balance on those notes could only be determined by the trial court if that debt related to the loss the victim suffered as a result of defendant's fraud. Here, the only possible connection between the 2008-2010 fraud loss and the 2005 notes is defendant's argument that he essentially repaid Lehman for the fraud by declining to enforce the notes against him. If, however, there was no quid pro quo involving enforcement of the promissory notes and the amount defendant defrauded from Lehman, the restitution amount should not be offset by the amount owed on the notes

A review of the record demonstrates that defendant did not, in fact, forego enforcement of the notes as a sort of quid pro quo to balance out the fraud debt; rather, he sold his interest in the

notes to pay a debt he owed, authorizing the assignee to pursue Lehman for the balance owed on the notes. Indeed, Dickinson Wright then sought payment of the notes in full from Lehman. Defendant now argues that because Lehman thereafter struck a deal with Dickinson Wright to pay less than the full amount owed on the promissory notes, Lehman should give defendant the remaining amount that he would have had to pay defendant if defendant had not sold the notes and had instead successfully foreclosed on the debt. Defendant argues that if he is not allowed that offset, then Lehman received a benefit because Lehman managed to negotiate a favorable settlement with Dickinson Wright. But defendant did not bestow any benefit upon Lehman; Lehman was left to face foreclosure of the assigned debt by Dickinson Wright. Defendant's failure to recoup the full balance on the notes is due entirely to his own decision, unrelated to the fraud case, to pay an outstanding debt to his attorneys by assigning to them his interest in the notes.[5] Whether Lehman thereafter struck a good deal or a bad deal with Dickinson Wright to discharge the debt under the 2005 promissory notes is unrelated to the question how much loss Lehman incurred by virtue of defendant's fraudulent acts in 2008-2010.

As discussed, restitution is awarded only for amounts that are a direct result of the defendant's criminal acts and only if the amounts can be easily ascertained and measured. *Byard*, 265 Mich App at 513. "The statutory scheme for restitution is separate and independent of any damages that may be sought in a civil proceeding. . . . Restitution is not a substitute for civil damages." *Lee*, 314 Mich App at 275. Although these principles typically are considered in the context of determining a victim's right to pursue damages in a civil action in addition to an award of restitution in criminal proceedings, the underlying premise that the determination of restitution is distinct from the adjudication of the rights and liabilities of the parties in a civil dispute is equally applicable here.

Because the relative rights and duties of the parties under the 2005 promissory notes is unrelated to the amount of loss that the victim suffered as a result of defendant's criminal acts in this case, the resolution of that civil dispute was outside the proper scope of inquiry when determining the amount of restitution owed in this criminal matter. Whether Lehman owed defendant money in an unrelated context (here, concerning the 2005 promissory notes) is irrelevant to determination of the loss created by the specific criminal acts that led to defendant's convictions. See *Lee*, 314 Mich App at 275. The trial court therefore abused its discretion by deducting from the restitution amount the amount the trial court ascertained Lehman owed defendant under the promissory notes.

## B. CASE NO. 346462

Defendant also challenges the restitution amount, and contends that the trial court incorrectly calculated the amount of restitution. Defendant first argues that the restitution amount

---

[5] Defendant chose to pay a debt of approximately $80,000 to his attorneys with notes ostensibly representing a debt of $410,000, rather than foreclosing on the debt himself and using the funds to pay his attorneys. One possible explanation for defendant's decision to assign the notes is that defendant believed that Lehman was uncollectible (because someone had stolen all of Lehman's money).

-9-

wrongly includes interest on losses that Lehman did not incur because defendant essentially cancelled the debt Lehman owed on the 2005 notes by declining to enforce the notes, and therefore there was no loss incurred by Lehman. As discussed, however, defendant's argument that he somehow benefited Lehman by declining to foreclose on the 2005 notes is without merit. Defendant also argues that the trial court should not have deducted from the note debt amount (which was offsetting the restitution amount) $50,000 in attorney fees that Lehman incurred to resolve the note debt with Dickinson Wright in connection with defendant's bankruptcy. Because we conclude that the restitution amount should not have been offset, whether the attorney fees should have been subtracted is moot.

Defendant also contends that the trial court miscalculated the interest for the years 2008 through 2014 because it was not calculated pursuant to MCL 600.6013(8). Defendant does not explain his argument and does not point to authority to support his contention that the interest was incorrectly calculated. Defendant's "mere statement without authority" is insufficient to bring an issue before this Court and leaves this Court "to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Wilson v Taylor*, 457 Mich 232, 243; 577 NW2d 100 (1998) (quotation marks and citation omitted). We therefore decline to address this issue. *Id*.

Defendant also contends that the trial court incorrectly ordered him to reimburse Lehman, when instead he should be ordered to reimburse the individual insurance companies and Lehman clients who were harmed by his conduct. Before the trial court, defendant argued that it was actually the individual clients who were defrauded and that Lehman has been reimbursed in part by an insurer. The trial court denied defendant's request and ordered defendant to pay the restitution to Lehman, the victim in this case, who would then have the obligation to provide the funeral services or otherwise compensate those clients or to reimburse insurers. On appeal, defendant makes the same assertion, but does not further explain his argument and does not point to record support or authority to support his argument that he should be entitled to determine to whom he should pay restitution. Again, because defendant fails to support his assertions with authority, we decline to address this issue. See *Wilson*, 457 Mich at 243.

We vacate and remand for correction of the restitution award consistent with this opinion. We do not retain jurisdiction.

/s/ Jonathan Tukel
/s/ Jane E. Markey
/s/ Michael F. Gadola

-10-